IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **United States of America** | Case No.   3:23-CR-201 (KAD) |
| v. | |
| **Gregory Butts,** | |
| Defendant. | |
| | April 17, 2025 |

### Government's Sentencing Memorandum

Gregory Butts comes before this Court with a lengthy history of predatory and malicious behavior. He is now awaiting sentencing for an offense involving his possession of child sexual abuse material.[1]

Under the terms of the plea agreement and the PSR, the sentencing guidelines recommend a sentence at the statutory maximum of 240 months. The government submits that this sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. Accordingly, the Government asks that the Court impose a total sentence of 20 years' imprisonment, followed by a lifetime of supervised release.

1.  **Offense Conduct and Procedural History**

The Presentence Report ("PSR") contains a thorough review of the undisputed facts. *See* PSR at ¶¶ 5 - 26. A summary of the relevant facts is provided below.

---

[1] Throughout this memorandum, the government uses the phrase "child sexual abuse material" (or "CSAM") interchangeably and synonymously with "child pornography," as that term is defined in 18 U.S.C. § 2256(8).

While on state probation for illegal sexual contact with a minor, Mr. Butts amassed a collection of more than 10,000 images and two videos of child sexual abuse material. PSR at ¶ 17. This includes more than 3,5000 images depicting minors who were previously identified by law enforcement. *Id.* Even more concerning, however, is his possession of child sexual abuse material that he acquired directly from minors while posing as "Jake Steeds".

### Minor Victim 1

*"Gregory Butts victimized my daughter and sexually abused her thru the Snap Chat app. It's difficult as a parent to see your child's innocence ripped away by such a sick individual…. No child should have to experience what [MV1] went thru. With Gregory off the streets this ensures another child's safety."* Father of MV1. *See* PSR, Third Addendum.

Mr. Butts' interactions with MV1 are well-detailed in the PSR. *See* PSR at ¶¶ 6-13. MV1 was only 11 years old when she first interacted with Mr. Butts (who she believed to be a 30-year-old named "Jake Steeds). Mr. Butts began by flattering MV1 into sending him sexually explicit images but it was not long before that tone changed from enticing to commanding her compliance. *Id.* at ¶¶ 10-11. A review of his messages with MV1 are notable not only for the demands he made on MV1 but, perhaps even more so, for the callous disregard he showed for her. *See* PSR at ¶ 13 (encouraging her to kill herself after he threatened to distribute her pictures).

### Minor Victim 2

*"Mr. Butts sent my daughter menacing comments and disturbing messages such as naked screenshots of her taken from the video chat, a photo of a male penis and more rape threats. She did not answer any of those calls and had no further contact with him. [MV2] was a child. She slept with stuffed animals. She never had a boyfriend. She was dedicated to her art and was pursuing that dream alone for the very first time in her life. This should have been the most glorious time in her life, and*

*this man has scarred that forever. The events of this day continue to plague [MV2]'s mental health.* " Mother of MV2. *See* PSR, Third Addendum.

The impact of Mr. Butts' offense with MV2 are explained in heartbreaking detail in the letter submitted by MV2's mother. *See* PSR, Third Addendum. The letter details the methods used by Mr. Butts to confuse and terrify a 17 year old girl into briefly complying with his demand for a video call. He took screenshots from that call and then used them to threaten her further. Despite being terrified, MV2 did not heed Mr. Butts' warning not to tell anyone about their call. She contacted her mother and immediately got local police involved.

Local and state police did what they could to identify "Jake Steeds" for both MV1 and MV2, but were unable to do so because of his efforts to conceal his identity (including using track phones and caller id blocking). It was only years later, when the identifiers for the "Jake Steeds" account were associated with Mr. Butts, that the pieces were put together with the help of the FBI and Connecticut Adult Probation.

**Interstate Threats**

In accordance with U.S.S.G. § 1B1.2, Mr. Butts admitted to threatening the family of two teenagers who were missing from their home in Colorado in November 2020. Shortly after their disappearance, a family friend distributed a Snapchat post containing details of their disappearance and a phone number to contact with information about their whereabouts. Mr. Butts dialed that phone number and, when it was answered by a male, he stated he would call back and demanded it be answered by a woman. He then terrorized and harassed that woman ("RG") with degrading and explicit details about sexual acts he wanted to engage in with RG and with

3

threats of harm to the missing teens. PSR at ¶¶ 19-23. Specifically, Mr. Butts stated that he had the missing teens and they would not be safe unless RG adhered to his demands. RG surreptitiously recorded the call. The recording reveals, in chilling detail, the threats Mr. Butts made. This threatening behavior was particularly malicious as he preyed upon and exploited the fears of the missing teens' family and friends.

**2.   Discussion of the Sentencing and § 3553(a) Factors**

**The § 3553(a) factors support a Guidelines sentence**

The Guidelines recommend a sentence at the statutory maximum of 240 months' imprisonment.[2] Considering the § 3553(a) factors, the government agrees that this substantial sentence is warranted and sufficient to achieve the goals of sentencing.

Starting with the nature and circumstances of Mr. Butts' offense. Child sexual abuse material is a scourge on the nation, one that inflicts two lasting traumas on its victims. First, the creation of child sexual abuse material necessarily "demand[s] the sexual exploitation and abuse of children," who are "seriously harmed—physically, emotionally, and mentally—in the process of producing" it. *United States v. Reingold*, 731 F.3d 204, 216 (2d Cir. 2013). Then, long after the physical abuse has ended, the images continue as "'a permanent record' of the depicted child's abuse, and 'the harm

---

[2] The guideline calculation in the PSR and the plea agreement varied in two respects: (1) the criminal history category (plea VI, PSR V) and (2) the offense level (plea 43, PSR 41). Under either calculation, the advisory guideline was 240 months' imprisonment. The Government agrees with the PSR calculation of a CHC category V and offense level of 41.

4

to the child is exacerbated by [its] circulation.'" *Paroline v. United States*, 572 U.S. 434, 440 (2014) (quoting *New York v. Ferber*, 458 U.S. 747, 759 (1982)). The result is that the most traumatic moments in the child's life become commodities traded on the internet by strangers for sexual gratification. *See Paroline*, 572 U.S. at 457 ("It is common ground that the victim suffers continuing and grievous harm as a result of her knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endured. . . . The unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse . . . plays a part in sustaining and aggravating this tragedy.") (citations omitted); *United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir. 2001) ("Although society at large is also a victim of these crimes, the primary, identifiable victim is the child portrayed, who must live with the knowledge that adults . . . can pull out a picture or watch a video that has recorded the abuse of that child at any time.").

As made clear from the victim impact statements submitted by victims of known series, the lasting impact of this cycle of revictimization is profound. PSR at ¶¶ 27-37.  Child sexual abuse material victims are "subject to a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder than other child sexual assault victims." Patti B. Saris et al., U.S. Sent'g Comm'n, *Federal Child Pornography Offenses* 113 (2012).[3]

The nature of the offense here was exceptionally disturbing because Mr. Butts'

---

[3]   Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

conduct was not as a passive possessor of child pornography. He interacted with minors to solicit, threaten and demand that they send him child sexual abuse material.

Mr. Butts' history and characteristics likewise support a Guidelines sentence. Mr. Butts' adult criminal history began when he was 16 and continued until his arrest on the probation violation that is related to this offense. PSR at ¶¶ 86-104. More than 35 years with 19 arrests and numerous probation violations, including a conviction for illegal sexual contact with a victim under 16 and two counts of risk of injury. In total he spent 155 months' incarceration with the longest continuous period being almost 5 years. PSR at ¶ 105. There is little evidence of Mr. Butts leading a law abiding life.

The government acknowledges that Mr. Butts has faced some challenges in his life, and the Court must consider those aspects of his background in fashioning a sentence. But those challenges do little to excuse his conduct or explain why he has been so relentless with his criminal behavior. Significantly, Mr. Butts continued to commit offenses even when being supervised by probation and receiving mental health and sex offender treatment. PSR at ¶ 104.

A Guideline sentence of 240 months' imprisonment is necessary to reflect the seriousness of Mr. Butts' offense, to promote respect for the law and to provide just punishment. It is also warranted to deter Mr. Butts and others who may consume child sexual abuse material. This is especially true when one considers that these crimes are almost always committed in secret. Congress, the Supreme Court, and the

Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See, e.g., Ferber*, 458 U.S. at 760 ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product."); *see also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand."); *United States v. Schrank*, 975 F.3d 534, 536 (6th Cir. 2020) ("[G]eneral deterrence is crucial in the child pornography context.") (citation omitted); *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) ("[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing[.]); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.") (citation omitted). Here, the Court has an opportunity to send a message to those who would "harm[] and debase[] the most defenseless of our citizens." *United States v. Williams*, 553 U.S. 285, 307 (2008).

In the Government's view, the most important goal of sentencing in this case is to protect the public from Mr. Butts. As noted above and in the PSR, Mr. Butts has a lengthy history of criminal offenses against people and property. In addition,

he committed this offense while under state supervision. That supervision did not deter Mr. Butts. To the contrary, he went to remarkable lengths to thwart probation's attempts to monitor him by obtaining and using numerous unmonitored devices and other techniques to avoid being held accountable for his actions. A lengthy term of imprisonment is necessary to protect the public, particularly vulnerable children.

### 3.     Restitution and Assessments

The Government has received several restitution requests for victims of the known series. The Government is attempting to contact counsel for the victims to determine if an agreement can be reached to resolve those requests before the sentencing hearing. However, if we are unable to do so, the Government will request an extension of 60 days for a restitution hearing. 18 U.S.C. § 3664(d)(5).

Mr. Butts is subject to a mandatory $5,000 assessment under the JVTA. Funds collected under the JVTA are deposited in the "Domestic Trafficking Victims' Fund." 18 U.S.C. § 3014(c). The Attorney General must "use amounts available in the Fund to award grants or enhance victims' programming" under the Trafficking Victims Protection Act, the Trafficking Victims Protection Reauthorization Act, the Victims of Child Abuse Act, or the PROTECT Our Children Act. Id. § 3014(e).

The assessment is mandatory unless the Court finds the defendant to be indigent. *See* 18 U.S.C. § 3014(a) ("[T]he court *shall* assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under ... chapter 110....") (emphasis added). In *United States v. Rosario*, 7 F.4th 65, 70 (2d Cir. 2021), the

Second Circuit concluded that determining indigency requires a review of the defendant's current financial status and his future earning potential:

> We agree with our sister circuits, concluding that when determining whether a defendant is indigent pursuant to section 3014(a), a court may consider both the resources available to the defendant at the time of sentencing and the defendant's future earning potential. See *United States v. Clarke*, 979 F.3d 82, 101 (2d Cir. 2020) ("When making an indigency determination, a district court 'may consider both [the] defendant's present financial resources and those that may become available in the future.' " (quoting *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001)).

The government read the personal financial statement submitted by the defendant but continues to have questions about the defendant's current and future financial status. In particular, he has a history of steady employment and professed his goal of becoming a productive member of society when released, PSR at ¶ 134, and questions remain regarding the property that was transferred to him for free from his mother in 2020 and sold two years later for almost $200,000. PSR at ¶ 147. Accordingly, the government requests the Court to conduct further inquiry to assess the defendant's indigency.

## 4. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a Guidelines sentence of 240 months of imprisonment and a lifetime of supervised release.

Respectfully submitted,

MARC H. SILVERMAN
ACTING UNITED STATES ATTORNEY

*Nancy V. Gifford*
NANCY V. GIFFORD
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct16324
450 Main Street, Suite 328
Hartford, CT 06103
Tel: (860) 947-1101
Nancy.Gifford@usdoj.gov

**CERTIFICATION**

I hereby certify that on April 17, 2025, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*Nancy V. Gifford*
NANCY V. GIFFORD
ASSISTANT U.S. ATTORNEY